DOUGLAS AND SUZANNE ASHBY,
individually and on behalf of all others similarly
situated,

                      Plaintiffs,

      v.

WYNDHAM VACATION RESORTS INC.,
COMENITY CAPITAL BANK, ALLIANCE
DATA SYSTEMS CORP.,

                    Defendants.

**CLASS ACTION
DEMAND FOR JURY TRIAL**

Case No.

**<u>COMPLAINT</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................. 1

II.     JURISDICTION AND VENUE ....................................... 2

III.    PARTIES ............................................................................ 2

IV.    STATEMENT OF FACTS ................................................ 3

       A.    Wyndham churns out unwanted credit applications and accounts under the guise of selling affordable leisure. ...................... 3

       B.    Consumers around the nation have complained about receiving Wyndham credit accounts they did not ask for. ...................... 4

       C.    At least one Wyndham employee has tried to blow the whistle on these practices. ....................................................... 17

       D.    Defendant Comenity joined with Wyndham's fraudulent scheme in 2018. ................................................................. 21

       E.    Defendants opened credit accounts for Plaintiffs without their knowledge or consent. ......................................................... 4

V.      CLASS ACTION ALLEGATIONS ................................ 24

       A.    Class Certification Requirements ...................................... 26

VI.     TOLLING OF ANY APPLICABLE STATUTES OF LIMITATIONS ...................... 28

       A.    Discovery Rule ................................................................. 28

       B.    Equitable Tolling ............................................................. 28

       C.    Estoppel ............................................................................ 29

VII.   CAUSES OF ACTION ..................................................... 29

       Count I – Violations of Missouri Merchandising Practices Act, Mo. Stat. §§ 407.010 et seq ............................................................ 29

       Count II – Violations of the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, § 2513 .......................................................... 30

Count III – Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681,
*et seq.* .......................................................................................................... 31

Count IV – Unauthorized Issuance of Credit Cards under the Truth in
Lending Act and Regulation Z............................................................ 32

Count V – Declaratory Relief ....................................................................... 34

VIII.   REQUEST FOR RELIEF ............................................................................. 35

# I.    INTRODUCTION

1.    Last July, Douglas and Suzanne Ashby ("Plaintiffs") attended a sales presentation in Branson, Missouri for the timeshare company Wyndham Vacation Resorts, Inc. ("Wyndham"). At that presentation, no one from Wyndham offered the retired couple a credit card or line of credit, and Plaintiffs never applied for a credit card or line of credit. Credit accounts were not discussed at all.

2.    Nevertheless, without the Ashbys' knowledge or consent, Wyndham and Defendant Comenity Capital Bank then issued Douglas and Suzanne each a new Wyndham-branded credit account with a $20,000 limit. The couple only found out about the accounts after they returned home, when they received a credit alert and letters in the mail "welcoming" them to the accounts they did not know about or ask for.

3.    What happened to Plaintiffs was not an isolated incident. Rather, as shown in media reports, consumer complaints, and a whistleblower lawsuit, Wyndham engaged in a nation-wide practice of using consumers' personal information to open credit cards or lines of credit without those consumers' knowledge or permission.

4.    As one deceived Wyndham customer in South Carolina complained to the Consumer Financial Protection Bureau ("CFPB") last year, "I have been in contact with dozens of Wyndham owners who have been lied to and tricked into having a credit report run this way. It is a pervasive problem throughout the Wyndham franchise."

5.    While this problem may be pervasive at Wyndham, it is not unique to Wyndham. This practice mirrors the notorious unauthorized account scandal at Wells Fargo that resulted in a $142 million class settlement approved by the Hon. Vince Chhabria in the Northern District of California in a case brought by undersigned counsel.

6.     These cases share a pattern: Companies put in place unrealistic sales goals for their employees and then apply intense pressure for the employees to meet them. Next, in the absence of adequate oversight or controls, the employees predictably find ways to game the system to create accounts for customers who do not ask for them, so the employees can meet their goals. Finally, the companies turn a blind eye, deny any wrongdoing, and try to minimize the scope of the problem until they are exposed in civil court proceedings like this one.

7.     Plaintiffs bring this case to put a stop to this pattern, hold Defendants accountable, and recover all available remedies for themselves and those whom Defendants similarly harmed.

## II.     JURISDICTION AND VENUE

8.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law. The Court also has jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a proposed class action in which any member of a class of plaintiffs is a citizen of a state different from Defendants. Finally, the Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

9.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because Defendants transact business in, are found in, and/or have agents in the Western District of Missouri, and because a substantial part of the events or omissions giving rise to the claim occurred in this District. Venue is proper in the Southern Division of this District under L.R. 3.2 because Plaintiffs' claim for relief arose in Taney County, Missouri.

## III.     PARTIES

10.     Douglas and Suzanne Ashby are and at all relevant times have been residents of Indiana.

11.     Defendant Wyndham Vacation Resorts, Inc. is a Delaware corporation and a subsidiary of Wyndham Vacation Ownership. Wyndham Vacation Resorts, Inc. has its corporate headquarters in Orlando, Florida.

12.     Defendant Alliance Data Systems Corporation is a Delaware corporation with its corporate headquarters in Columbus, Ohio.

13.     Defendant Comenity Capital Bank is a Draper, Utah industrial bank and a subsidiary of Comenity LLC and Defendant Alliance Data Systems Corporation.

### IV.     STATEMENT OF FACTS

**A.     Wyndham churns out unwanted credit applications and accounts under the guise of selling affordable leisure.**

14.     Wyndham is a resort and timeshare company that promotes itself as a consumer-friendly way to own or have access to premier vacation resorts. It "markets and sells vacation ownership interests and provides consumer financing to owners through its three primary consumer brands, Wyndham Vacation Resorts, WorldMark by Wyndham, and Wyndham Vacation Resorts Asia Pacific."[1] Wyndham claims "more than 830,000 owners of vacation ownership interests."[2]

15.     Defendant Wyndham Vacation Resorts, Inc., one of those Wyndham brands, provides access to resorts around the nation for "Club Wyndham" members.[3]

16.     But Wyndham does more than manage resorts—it also issues credit cards through partner banks. For example, Barclays Bank Delaware issues the "Wyndham Rewards Earner"

---

[1] Wyndham Vacation Resorts, *About*, https://www.wyndhamtrips.com/maps/about.asp.
[2] *Id.*
[3] *Id.*

card.[4] And, relevant to Plaintiffs' claims, Defendants Alliance and Comenity issue a Wyndham-branded "Vacation Club Credit Account."[5]

17.     As alleged in detail below, Wyndham has for years engaged in a systematic practice of creating those credit cards for consumers without the consumers' consent or knowledge. Last year, it did so to Plaintiffs.

**B.     Defendants opened credit accounts for Plaintiffs without their knowledge or consent.**

18.     Douglas and Suzanne Ashby are retirees in their seventies living in Beverly Shores, Indiana. Before retirement Mrs. Ashby was a nurse, Mr. Ashby was an electrician.

19.     Because they are Club Wyndham members, in June 2020 they received an invitation to stay three nights free-of-charge at a Club Wyndham property in Branson, Missouri. The catch: They had to attend a timeshare sales presentation while there. The Ashbys accepted that offer.

20.     Last July, the Ashbys drove to the Wyndham property in Branson, and on July 25 they attended the required sales presentation. At that presentation, Wyndham representative Jack McCoy first tried to get them to buy a deeded property. They declined. Next, Wyndham representative Sean Beckham pitched the couple on buying "points" for use on future Club Wyndham vacations. The couple eventually agreed to buy 400,000 Club Wyndham points for $3,375 using an existing credit card.

21.     At no point during the presentation that day did any Wyndham employee mention or in any way discuss opening a new credit card or line of credit for Douglas or Suzanne Ashby.

---

[4] Wyndham Rewards, *You've earned this*, https://www.wyndhamrewardscreditcard.com/
[5] Comenity Capital Bank, *Vacation Club Credit Account*, https://d.comenity.net/ac/vacationclub/public/home

22.     At one point, Mr. McCoy did ask the Ashbys for their driver's licenses and Social Security numbers. When they asked why Wyndham needed this information, Mr. McCoy told them it was so the Ashbys could get "the best deal." Mr. McCoy did not say it was to prequalify or apply for credit. The Ashbys relied on this misrepresentation and omission.

23.     The document to buy points that the Ashbys signed that day, titled "Wyndham Vacation Resort, Inc. Club Wyndham Discovery Membership Agreement," does not mention a credit card account or line of credit, and it does not authorize Defendants to submit a credit application or open a credit account for the Ashbys. That document merely permitted Wyndham "to obtain credit information about the [Ashbys] from a Consumer Reporting Agency, which Wyndham may use as permitted by applicable law." In the same document, the Ashbys also indicated (by selecting certain options within the document) that Wyndham could not share the information they provided to Wyndham with Wyndham's affiliates.

24.     Because Wyndham's representatives never discussed with them the creation of a credit account, the Ashbys were shocked after returning home from Branson to each receive letters dated July 26, 2020—the day after the sales presentation—welcoming them to "Your Vacation Club Credit Account." The letters informed them that they each now had a credit card account with a credit limit of $20,000 issued by Comenity Capital Bank:



25.    They were likewise shocked to receive an Experian credit alert after their visit to Branson informing them that a Wyndham-branded credit account issued by Comenity Capital Bank had been opened in their name:



26.    The Ashbys never received the credit cards themselves or any credit card agreement or other line of credit agreement associated with the unwanted accounts. And they never activated or used the credit cards or any line of credit.

27.    The Ashbys promptly protested that the accounts had been opened for them without their knowledge or consent. After those complaints, Comenity closed the accounts in August 2020, but not before it damaged the Ashbys' credit.

28.    Wyndham, however, repeatedly stonewalled the couple. Eventually, on November 23, 2020, Mr. Ashby wrote to Wyndham employee Vincent Vega to complain about the

unauthorized accounts. "No one at this presentation ever mentioned about a line of credit," he wrote. "I came with all good intentions and was deceived & treated very poorly by your company's employees." Mr. Vega responded over the phone that Mr. Ashby had no claim because, according to Wyndham, Mr. Ashby had agreed to a credit account, but Wyndham was not able to provide to the Ashbys any credit applications in their name.

29.     Douglas and Suzanne Ashby never consented to credit prequalification or the opening of a credit account in their name or manifested any intent to be bound to a credit pre-qualification, application, or agreement in July 2020. They likewise never agreed to arbitrate any claims related to that credit account or manifested any intent to be bound to an arbitration agreement. They never saw—and have still never seen—any credit card agreement or arbitration agreement related to the Wyndham-branded Comenity credit cards opened in their names in July 2020. Any such agreement would be void *ab initio* due to fraud in the execution.

30.     Defendants left Plaintiffs and Class Members to face the substantial consequences of the unauthorized credit checks and unwanted credit card accounts, including harmed credit and increased cost of borrowing.

## C.     Consumers around the nation have complained about receiving Wyndham credit accounts they did not ask for.

31.     What happened to Plaintiffs was part of a well-established pattern. The same or similar fraudulent credit card practices that victimized Plaintiffs have been the subject of numerous consumer complaints, as seen in the CFPB's complaint database, the Better Business Bureau's records of complaints, news reports, and other websites.

32.     Those complaints all share a core set of common facts with what happened to the Plaintiffs: In the context of high-pressure, deceitful sales pitches, Wyndham employees obtained

the personal information of customers under false pretenses and then used that information to submit applications for credit and create credit accounts without those customers' knowledge.

33.     For example, the CFPB's database of consumer complaints features many narratives from consumers that mirror Plaintiffs' experience.[6] Here is a sample, with emphases added and redactions in the original:

- March 4, 2020, Virginia: "I received in the mail an unsolicited and unwanted credit card, apparently affiliated with a timeshare. I did not activate the card.  . . . I notified the company, Barclay bank that I neither was informed of any credit card application; nor authorized; nor signed any application.  I spoke to five different employees, one twice (XXXX) in Customer Service, Fraud, and a Supervisor. I was appalled to learn Barclays perspective - that the timeshare company (Wyndham) has the opinion I authorized the card. **Not only have I received negative impact to my credit score by issuing this card fraudulently, cancelling it becomes another adverse credit event**. This is unacceptable, and I seek your assistance to rectify this atrocious conduct.

- November 14, 2020, Idaho: "I was sent a credit card opened in my name for Wyndham Rewards that I did not apply for. I called the company back and informed them I did not open a credit card account with them and they needed to close the account. . . .  **Someone in the Wyndham company is getting cards using some of their members information that attend their meetings during their vacation**. This is a corrupt business and it should be stopped and all of the employees need to go to jail and pay restitution to all of its members that have been held hostage to their contract only to find out that their personal information is being traded and compromised."

- November 21, 2019, Minnesota: "I attended a Wyndham seminar. I provided information to check on financing, which I declined. And I consented to being sent promotional emails. **Later that day I received an email that I was approved for a credit card with Barclays and that the card was in the mail. I never asked for or consented to being signed up for a credit card. Credit card terms were never discussed. No credit card was ever discussed at all.**"

- February 6, 2020, Pennsylvania: "My Husband & I sat through a Wyndham Vacation club presentation . . . . **We were asked for my Husband's SS # and signatures for their files. We were told that they needed this for informational purposes only and they required it to give us our gift of XXXX free points for sitting through the presentation. We were told they would not check our credit or do anything with the**

---

[6] *See generally* CFPB, *Consumer Complaint Database*, https://www.consumerfinance.gov/data-research/consumer-complaints/

information. **We started getting alerts from XXXX the next day. We also were notified that we were both approved for a Wyndham VISA credit card in each of our names - with a credit limit of {$30000.00} each**. . . . . We did not give anyone permission to check our credit and/or apply for a credit card. It's my understanding that this may have a negative effect on our credit rating and would like to have it removed from our credit report."

- January 7, 2020, South Carolina: "I went to a Wyndham sales presentation . . . . I am a Wyndham owner and already have a Wyndham credit card. When I was speaking to the salesman, I was clear that I did not intend to make a purchase, and told him that both my husband and myself have Wyndham credit cards. The salesman asked us to make sure our account information was up to date and had us sign a statement that it was. About 10 days later, I received two notices from Barclay's Bank, stating that we did not qualify for the credit cards that we applied for because we already had open accounts. **I have been in contact with dozens of Wyndham owners who have been lied to and tricked into having a credit report run this way. It is a pervasive problem throughout the Wyndham franchise**."

- March 3, 2020, New York: "I attended a Timeshare Presentation . . . . After this presentation the representative asked for our social security and state ID in order to run a credit check to see if we could qualify for their timeshare program. We declined to participate in their program and explicitly stated we did not want to be involved in any of their programs. **During no point in time during their presentation did they state they would open a line of credit for us, nor did we ever state that we wanted to apply for their rewards card. They used my information to open a new credit card without my knowledge. On XX/XX/2020 I was notified that a new credit account was opened in my name in my XXXX credit report.** The company BARCLAYS BANK DELAWARE opened a new WYNDHAM VISA REWARDS credit account. The account was opened on XX/XX/2020 without my knowledge."

- July 31, 2020, Utah: "**During this tour I was asked to provide my personal information such as my name, address, phone number, social security, etc. I was told this information was needed to verify my qualification for the timeshare. I also was assured that my information would not be used for anything other than verifying qualification unless I accepted the timeshare. On XX/XX/2019 I received an email from XXXX stating there was a change to my credit report. An account was opened under Barclays Bank.** . . . . **My information was stolen and my privacy has been invaded. I did not request for this and the credit bureaus have made it clear they cannot assist in repairing the damage that was caused to my credit.** I feel I'm being labeled as a liar and I would like to know what can be done about this."

34.     In addition to those complaints to a federal agency, the Better Business Bureau's website includes many similar complaints or negative reviews. For example, a "Joseph U." complained in February 2020 that after a Wyndham sales pitch in Las Vegas, Nevada "I received a welcome letter to my Vacation Club Credit Account" even though he was never told he was applying for a credit card. That is the same type of credit account Defendants created for Plaintiffs without their consent.

35.     Likewise, in 2018, a consumer complained to the Better Business Bureau that Wyndham opened a credit card in his name without his permission after he attended a sales pitch in Branson, Missouri—*the same place* where Plaintiffs were deceived two years later:



Jared E.
★☆☆☆☆                                                          07/23/2018

I took vacation to branson mo. I pre ordered tickets online and picked them up at a visitors center. While I was there getting tickets they advised if i wanted to see any other shows in town I said yes and bought 3 other tickets for shows but in order to get them I had to do a 2 hours preview of a venue. No big deal. I get through the tour and i was brought to sit in this room. Was pressured to sign up for vacation time share. THEY DID NOT TAKE NO FOR AN ANSWER. 3 hours later I am leaving after advising them NO I DONT WANT TO BUY ANYTHING. They made me late to a different show. Get home 3-4 days later realize my credit was ran by them after not giving them permission to do so AND a $15,000 credit card was opened in mien and girlfriends name. I DID NOT AUTHORIZE THIS THEY ARE CROOKS AND NEED TO BE SUED

36.     Other examples from the Better Business Bureau follow:



**Complaint Type:** Problems with Product/Service    **Status:** Answered ?

07/20/2018

A credit account was opened in my name by Wyndham Club Resorts in the amount of $20,000 without receiving my consent. An account under my name was created without my authorization. After multiple declinations an account was created without my consent or awareness. This experience is no less of identity theft at its highest form. Because I have credit monitoring on my account I was notified by USAA that an actual account, that I did not ask for, was opened in the amount of $20,000 on July 4, 2018.

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered 



03/26/2019

Used my ss# to open a new credit account when I was not aware that was to be the case Went for a Wyndham account update. Agreed to have ss# ran for CREDIT CHECK only should we decide to increase our vacation points. At no time was a new credit card, vacation account discussed. About a week later, I had received a new account with a $25K limit that was titled vacation account. This was done fraudulently, without my knowledge. And if I signed something, I received NO paperwork from Wyndham notifying me this was the case. Again, my social security #, as explained to me, was going to ensure my credit was ok, that nothing had changed in the 2 years since we became Wyndham "owners", and would save time if we decided to move forward with additional points. I called the company that evening, after receiving notification thru the mall of the new account, and was told that it would put in paperwork with the credit bureaus so it would not go against my credit. At the Alexandria, VA location, I dealt with Bridgett and Tamika (Spelling may not be 100%) and I have no last names. So, one of the two of them, and I am assuming Tamika since she is the one who went to "run my credit" used my social security # fraudulently.



Alexander B


07/17/2019

The company lies, I never bought the product but made the mistake of entertaining them. Do not give them any information, a credit card account was opened without my permission, and I only found out after about two weeks when I received a letter welcoming me to something I had never signed up for. My salesman was Dakota he is a former officer in Vegas and I would not trust a word out of his mouth or anybody else with that company, they are probably working to get out of their own timeshares.



D.Th. Tate


07/29/2019

Absolute con artists. Bait and switch. Hidden terms and conditions. They opened a credit card in my name and my wifes name. (Two separate cards) We did not ask for this and declined all of their offers. I am a disabled combat veteran. I am also retired from the D.O.D. I will be advising all service members to stay clear of this scam.



**Crystal M**

★☆☆☆☆

09/01/2019

On August 10th, 2019 I went to a sales presentation for Wyndham Vacation Club while I was on vacation at Myrtle Beach, SC. I am all too familiar with the time share scheme so my only intentions during this meeting was free breakfast and discounted tickets. After siting through a horrible sales presentation and touring one of the oceanfront hotels, I let the sales rep know that I am not interested in joining the club. It just didn't make since for me to join at this stage in life. The sales rep then got one of the sales managers to talk to us, I told him the same exact thing I AM NOT INTERESTED. I secured my discounted tickets and left the preview center. I thought that would be the last I heard from Wyndham until I came home from vacation. In the mail was a letter from Wyndham Vacation Clubs stating that a $20,000 line of credit has been opened for me to purchase a time share. I was completely shocked and outraged. I told the sales reps specifically that I am not interested in becoming a Wyndham member. I never signed ANYTHING approving them to open a line of credit on my behalf. This letter was dated August 11, 2019 so they FRADULENTLY opened an account in my name the day after I specifically told them that I do not want to become a member. I have closed the account but now I must fight with the credit bureau to dispute this account that I DID NOT AUTHORIZE. I encourage anyone that is on vacation to pay full amount for tickets or check Groupon. Attending a sales presentation for any hotel company time share is not worth it.



**Christina C**

★☆☆☆☆

09/22/2019

They lied to me after saying they wouldn't run my credit, or hard inquiries. They lied about not opening credit cards and they did. I went from a 749 to 636 they screwed my credit up while trying to buy a home. Stay away from this company!!!!



**Ashley S**
★☆☆☆☆

10/10/2019

THIS COMPANY DOES SCUMMY PRACTICES. THEY WILL BLATANTLY LIE TO YOU TO GET YOU TO SIGN UP FOR A CREDIT CARD. BEWARE OF THIS COMPANY!! While on vacation me and my fiance agreed to what we were told was going to be a 2 hour presentation. It ended up being about 4 hours. The initial presentation wasn't to bad. The lady that sat down with us was nice she was pretty realistic with us for the most part. At first she was honest with us and said that she did need to run our credit to see if we qualify for the program. We were fine with that since we were slightly interested in it and we were not in the process of purchasing anything that would need it at the time. She came back and we qualified she then proceeded to show us one resort that Wyndham has to offer. After she showed us two of the rooms at the resort we made up our mind and let her know that we would not be interested in doing the program. Next we talked to one man and another woman they then tried every sales tactic in the book to sell us this program. They had us sign some paperwork they said that they needed the paperwork. I asked them FOUR times if this had anything to do with a credit card I do not wish to have a credit card at this time. The woman told me NO we are not getting a credit which was a blatant lie and now both me and my fiance have a credit card that we do not want nor have any reason to use. I will never have anything to do with this company again.



**Kim E**
★☆☆☆☆

12/28/2019

I was signed up for a VISA credit card without my consent nor permission. When talking to the Wyndam Associate, they informed me they needed to run my credit to see what rate on a timeshare I would get approved for, ot to apply for a credit card. This is just fraudulent business and I will never do business with a fraudulent company again.

**Complaint Type:** Advertising/Sales Issues    **Status:** Answered ⑦



07/06/2020

Wyndham is a business that will provide misleading information to customers to get a hold of their personal information and tied them to contracts. On February 2020, we had a presentation in Honolulu, HI in which we were told that the product Wyndham offer was not a timeshare. During the whole presentation we explain to our sales person that we couldn't do a long term contract due to our financial situation as well as our immigration status. We were told it was a plan that offer the flexibility to cancel at any time if needed. We were also told that all we needed to do was call the care line and they would cancel our contract with no issues, which is a lie. They also used our personal information to open up a line of credit without our consent. They never showed us any contract to a line of credit that has an interest of 24%. We would've never agreed since we have a credit card that has only 4% in which we have a $12,000.00 limit. They asked us for a credit to charge the down payment, but which we provided but instead they open this line of credit that we weren't even aware. Now we are stuck trying to dispute all of this because they its basically fraud and identity thief. They ran our credit open a line of credit without our consent and with our providing any documentation of what the interest was or payments. Therefore we don't want to continue any relationship with a company that steals your identity and commits fraud. We are trying to handle everything ourselves, but we will be pursuing legal help if needed to end this contract and also to sue them for identity thief and fraud.We wrote a letter to both Wyndham and Comenity bank to ask for cancelation and no success at the moment we are still working with them and hopefully we can get our of this nightmare.



Joseph U
★☆☆☆☆

02/25/2020

Attended a presentation in Las Vegas, NV. Was told the presentation would take 2 hours. I was there for 3 hours and 45 minutes. during the presentation I had to fill out some paperwork, which appeared to be a credit application. I asked if I was filling out a credit application and was told no. I explained that the bottom of the electronic form required me to click apply and it appeared as though I was filling out an application. I further told the representative that I did not want to apply for any type of credit whatsoever. The representative told me I was not applying for anything but they needed to pull my credit to see if I qualified for the program. I was suspicious but proceeded with the forms. I ultimately found no value in the club and determined it to be a poor investment and declined to enroll. Upon returning home from my trip I received a welcome letter to my Vacation Club Credit Account. I was directly lied to by the sales person trying to get me to enroll. I now have credit account I did not want and was told I am not applying for. I have called Vacation club credit which is issued by Comenity Capital Bank and closed the account. I caution anyone visiting these presentations to not fill out any paperwork or for that matter not participate in them.



**Josh N**
★☆☆☆☆

03/09/2020

One word to describe this whole thing: SCAM. They unknowingly sign you up for credit and then when you cancel, they give you a run around and refuse to remove the remaining payments. They still refuse to remit our money and we are having to deal with harassing phone calls. We will be filing a complaint with the FTC shortly.



**Steven G**
★☆☆☆☆

03/19/2020

Was tricked into getting into a contract with Wyndam for a rental timeshare. They opened a line of credit without my approval, charged this line of credit with my approval, and then told me I cant use the rental for 50% of my contract. The sales people are crooks, the customer service is the worst, and the company is devoid of any morals and ethics. I had the customer service person actual admit on a recorded line, "We screwed you". The worst piece if business I have ever experienced.



**Tasha Z**


09/12/2020

I recently went to Worldmark's time share presentation and declined their timeshare. They are a very shady company and automatically sign you up for a ********** credit card without telling you! I've tried reaching out to their corporate office and they give you the run around. I would never go to another timeshare presentation with them nor would I do business with them! SHADY!!!



**Justin A**


11/04/2020

We were first introduced to Wyndham when we were offered gifts to attend a presentation. Once there, we were in a packed room with no ventilation for over 5 hours. We were not interested in the rep's talking points about supposedly affordable travel opportunities, but they just kept making different offers. It was then that they tricked us into taking out a loan for the purchase, reassuring us that our bank could refinance it to pay at a lower interest rate. Upon our return home, we found this wasn't true. Plus, the "rewards program" they signed us up for was actually a credit card. We would never have agreed had we known they'd do that, or that they would constantly harass us by phone to buy more points. Don't make a purchase with Wyndham that you'll surely regret!



**Pete D**
⭐️☆☆☆☆

12/08/2020

We originally visited a Wyndham property on a free stay in exchange for attending a presentation. This presentation went on for several hours until we finally said yes to an offer because we felt that this would help us travel more and that it was within our budget. This was nowhere near the truth! Every time we have tried to use this, we have been unsuccessful. We also learned that not only were we paying more per month than we had originally been told, but they also signed us up for a credit card without our knowledge to charge part of the cost. Be very careful about accepting any free vacations from this company!

37.     Customers have also complained on travel websites, like this person who posted on TripAdvisor after attending a Wyndham timeshare pitch a year ago: "We left the presentation, and hours later we got an email (both my husband and I) saying we each have a credit card opened under our names - $17K total. We were flabbergasted . . . . We were lied to during the sales pitch . . . ."[7]

38.     Another TripAdvisor user reported receiving a letter from Comenity Capital Bank "congratulating" them on a credit account they did not ask for: "we questioned the sales rep as to why they needed the information and specifically stated that we had no interest in applying for credit . . . Our credit score was over 800 prior to leaving on vacation is now mid 750s."[8]

39.     Similarly, in 2018 one Tennessee couple recounted to a local news station how they attended a lengthy Wyndham sales pitch after being told they could come in to claim a "very expensive gift."[9] Even though the couple refused to purchase anything, they received a letter several weeks later saying Wyndham had opened up a $15,000 line of credit in their name,

---

[7] Tripadvisor, *Wyndham fraud/scam*, https://www.tripadvisor.com/ShowTopic-g1-i10700-k11617798-o10-Wyndham_fraud_scam-Timeshares_Vacation_Rentals.html
[8] Tripadvisor, *Wyndham fraud/scam*, https://www.tripadvisor.com/ShowTopic-g1-i10700-k11617798-o30-Wyndham_fraud_scam-Timeshares_Vacation_Rentals.html
[9] Jennifer Kraus, NewsChannel5, *Couple Goes To Wyndham Timeshare Meeting, Unknowingly Gets $15K Line Of Credit* (May 3, 2018), https://www.newschannel5.com/news/newschannel-5-investigates/consumer-alert/couple-goes-to-wyndham-timeshare-meeting-unknowingly-gets-15k-line-of-credit

and that they "unknowingly applied for a Wyndham Rewards Visa card that same day."[10] The couple reported that during the lengthy sales pitch there was never any discussion of opening a credit account for them. "We probably aren't the only ones they done like this," one of the defrauded individuals said. "And, it really makes me mad."[11]

## D. At least one Wyndham employee has tried to blow the whistle on these practices.

40.    Despite years of consumer complaints, it does not appear that any government enforcement agencies have stepped up to put a stop to these practices.

41.    However, one former Wyndham employee—Patricia Williams—blew the whistle on the "rampant fraud" she witnessed in Wyndham's San Francisco office. Wyndham fired her. In a post-trial order in her wrongful termination case, attached as Exhibit A to this Complaint, the trial court found that "Wyndham's conduct was highly reprehensible; Wyndham fleeced elderly people rampantly." Exhibit A at 5. The trial resulted in a $12.8 million punitive damages award. *Id.* at 7.[12]

42.    The former employee alleged in her complaint that Wyndham employees would tell Wyndham customers "to fill out paperwork to lower interest rates and payments, however the owners were actually applying for. . . credit cards . . . and being sold more points without their knowledge or permission. The credit card would not bill them for weeks and by then it was too late to rescind the purchase." The employee also alleged that Wyndham would have owners sign credit card applications by telling them that they were something else.

---

[10] *Id.*

[11] *Id.*

[12] *See also* Gretchen Morgenson, THE NEW YORK TIMES, '*My Soul Feels Taller': A Whistle-Blower's $20 Million Vindication* (Nov. 25, 2016), https://www.nytimes.com/2016/11/25/business/my-soul-feels-taller-a-whistle-blowers-20-million-vindication.html (explaining Williams' allegation that at Wyndham "credit card accounts were opened for buyers without their knowledge and approval").

43.     Among the fraudulent practices detailed by the trial court—practices with colorful names like "pitching heat," "buy back fraud," or "TAFT (Tell Them Any Frigging Thing) Days"—was the practice of Wyndham's salespeople financing "timeshares *by opening credit cards in customers' names without their knowledge*." Exhibit A at 1 (emphasis added).

44.     Trial testimony in that case shows that fraudulent sales practices are widespread—even encouraged—at Wyndham, and that Wyndham's employees replicated those practices when they defrauded Plaintiffs. That includes evidence that Wyndham employees told customers they needed their personal information to get the best deal—the same thing Wyndham told Plaintiffs—when in fact it was used to open a credit card in their name.

45.     For example, Robert Parker—a manager in a Wyndham office in San Francisco— testified in 2016 that the office's top salesperson, Anita Howell, regularly gave customers credit card applications to fill out but lied about what they were:

**Q:** Were there any instances in which you were aware that people were filling out credit card applications that were given to them by Ms. Howell where they didn't understand that what they were doing was actually taking out a credit card?

**A:** Oh, absolutely.

**Q:** Tell me what it was that you knew about Ms. Howell's practice in that regard.

**A:** Well, a lot of the verbiage would be "We just need this information to update our files," "We need this information for this," "I believe Wyndham owes you so if you fill this out I'll see if I can get you special financing or special whatever."….It was more, "We just need this for updating the information in our file, fill this out." And then of course, "We just need your ID to confirm this is who you are."

….

**Q:** Did you observe Ms. Howell tell people that she was going to try to get them some benefit if they would fill out a particular form?

**A:** Sure.

**Q:** Or tell people who were filling out these credit card applications that she was doing so to try to update their file?

**A:** Correct.

**Q:** Or asking these people who were filling out these credit card applications to provide her information to see if she could get them some special deal from Wyndham?

**A:** Correct.

**Q:** When in actuality, she was taking their ID and the application and taking out a credit card for them, correct?

**A:** The application was a credit card application, correct.

**Q:** So, she would have them fill out the credit card application and submit it while telling them is was for something else than obtaining a credit card?

**A:** Correct.

46.     Mr. Parker recalled responding to complaints from customers who received credit cards but did not apply for one. A central Wyndham office also sent those complaints—called sales compliance information forms, or SCIFs—to a Wyndham vice president in the office.

47.     Mr. Parker testified that as a manager he felt like he was in a "Catch 22" when asked to investigate these complaints, because as a manager he relied on employees like Ms. Howell for his bottom line; "however, there is the moral part where you're like, 'Man, that's so bad.'" Essentially, his advice to employees defrauding customers was to not get caught.

48. Ms. Howell denied much of this, but the behavior Mr. Parker attributed to her was not unique. According to Mr. Parker's testimony, employees like Ms. Howell who behave the worst often are the most successful and therefore the most emulated. For example, she sold an estimated $15 million worth of timeshares for Wyndham during her time in the San Francisco office. Because these employees made the most money, other employees wanted to learn how to replicate their fraudulent behavior—to "follow their lead," as Mr. Parker testified.

49. "People tend to ask them, 'What are you saying, what are you doing' and they tend to either try it or follow it or do it and believe it's okay, or don't because they can't," as Mr. Parker testified. The San Francisco office even had a catch phrase about the need to stretch the truth when talking to consumers: "No heat, no eat."

50. And because employees often moved around to different Wyndham offices across the nation, those bad practices were seeded office-to-office, as salespeople looked for any edge to meet their sales quotas and maximize their incomes.[13] "It was definitely a domino effect of bad behavior if someone believes that's how you can win and make more money," Mr. Parker testified.

51. Before Ms. Williams trial, Wyndham offered to settle her case, but she would only do so if Wyndham promised to change its practices. "For example, she demanded that the company record on video all sales encounters its representatives had with customers and present buyers with a simple form that would make clear what they were agreeing to in their contracts."[14] Wyndham declined to make those changes, according to Ms. Williams, so she refused to settle.

---

[13] *See also* Gretchen Morgenson, THE NEW YORK TIMES, '*My Soul Feels Taller': A Whistle-Blower's $20 Million Vindication* (Nov. 25, 2016), https://www.nytimes.com/2016/11/25/business/my-soul-feels-taller-a-whistle-blowers-20-million-vindication.html ("Wyndham's sales goals for employees were impossible to meet if representatives adhered to the company's policies and regulations governing time-share sales[.]").

[14] *Id.*

**E.    Defendants Alliance and Comenity joined with Wyndham's fraudulent scheme in 2018.**

52.    Despite these red flags about Wyndham's credit practices, in June 2018 Comenity's parent company, Alliance Data, announced it had "signed a new agreement to provide private label credit services for Wyndham Vacation Clubs, the vacation ownership business of Wyndham Destinations."[15]

53.    Alliance, through Comenity, is one of the largest—if not the largest—issuers of co-branded credit cards in the United States. It boasts of over 50 million cardholders. Comenity credit cards are co-branded with retail stores, travel services, gas stations, auto dealers, healthcare providers, and financial institutions. Comenity, however, has a reputation for poor consumer credit practices; the website Credit Card Insider warns that "We've received many negative reports about Comenity credit cards."[16]

54.    Alliance, Comenity's parent company, markets itself as "so much more than a bank"—it is "a leading provider of data-driven marketing, loyalty and payment solutions." Through its account origination practices, it collects the most private financial information from customers, which—on information and belief—it shares with affiliates for marketing purposes.

55.    Alliance in 2020 had assets that exceeded $20 billion, and it reported over $1 billion in revenue in the third quarter of 2020. As Alliance's then-CEO said in 2013, "We're probably the largest company that nobody's heard of. Our job is to be invisible."

56.    According to Comenity/Alliance, it has been integral in designing and launching Wyndham's credit program: "Alliance Data will develop and launch a credit program designed

---

[15] Press Release, Alliance Data Systems Corp. (June 12, 2018), https://www.sec.gov/Archives/edgar/data/1101215/000110121518000126/exhibit_99-1.htm

[16] Credit Card Insider, *Comenity Bank Credit Cards*, https://www.creditcardinsider.com/credit-cards/comenity-bank/.

to provide future and current timeshare owners convenient, flexible payment and financing options for down payments and upgrades."[17] A stated goal of that program was to "drive credit applications" like the unauthorized application submitted for Plaintiffs and to use Alliance's data to influence "campaigns to increase credit applications."[18]

57. To obtain a lawful credit account application, Defendants would need to get Plaintiffs' and Class Members' express consent at two steps: prequalification and then a credit application.

58. If a person is pre-qualified for a card, then an application for credit is submitted by a Wyndham employee—or an employee of one of Comenity's other partners—on behalf of a consumer. Once Comenity receives such an application, Comenity requests credit reports from consumer reporting agencies like Transunion, Equifax, and Experian. Comenity also reports credit card account activity to consumer reporting agencies.

59. Alliance and Comenity's Wyndham cards are like traditional credit cards in that these "hard" credit inquiries are conducted before Comenity determines whether to issue the card. Hard inquiries have two effects: they allow lenders to view the applicant's credit report and they inform future potential lenders and credit card companies that the applicant had previously sought credit. Additionally, as with standard credit cards, card activity is reported to major credit bureaus and can affect a consumer's credit score and credit report.

60. Although Alliance and Comenity acquired the right and responsibility from Wyndham to process consumer credit applications and issue Wyndham-branded credit cards,

---

[17] Press Release, Alliance Data Systems Corp. (June 12, 2018), https://www.sec.gov/Archives/edgar/data/1101215/000110121518000126/exhibit_99-1.htm.
[18] Id.

upon information and belief, Alliance and Comenity did not take adequate steps to determine whether Wyndham continued to engage in deceptive practices.

61. Instead, Alliance and Comenity continued to rely on Wyndham sales staff to procure credit applications, which Alliance and Comenity then submitted to consumer credit bureaus before issuing credit cards in the names of consumers. On information and belief, Alliance and Comenity did not question whether such applications were valid and authorized by the consumer in whose name the account was opened.

62. As the bank that submitted credit inquiries to consumer credit bureaus and issued credit cards in the names of consumers, Alliance and Comenity had the duty to ensure the credit applications were authorized. Rather than reasonably investigate the legitimacy of the credit applications—particularly where they were supplied by a business subject to numerous complaints like Wyndham—Alliance and Comenity failed to investigate the matter, or willfully ignored it. Alliance and Comenity failed to live up to their duty, to the detriment of Plaintiffs and the classes.

63. This is not the first time Alliance or Comenity's unfair consumer practices related to its co-branded credit cards and credit card accounts have been scrutinized. In 2015, the Federal Deposit Insurance Corporation ("FDIC") entered into a settlement with Comenity regarding the bank's deceptive practices and material misrepresentations and omissions in relation to credit card add-on products. Comenity paid a $2 million penalty and $53 million in restitution to harmed consumers as part of the settlement.

64. Unfortunately, the government actions were apparently insufficient to deter Comenity from continuing to wrong consumers. After its settlement with the FDIC, Comenity

continued to allow unlawful business practices to prevail, exemplified by its approval of fraudulent credit account applications submitted by Wyndham for people like the Ashbys.

65.    To establish the nature and scope of Defendants' misconduct, Plaintiffs will seek discovery including but not limited to:

- all documents and other evidence regarding the credit card application submitted under Plaintiffs' names;

- all sales scripts relating to credit card applications;

- all digital or paper credit card application forms;

- all technical roadmaps of customer card program experience and the training materials for retail store associates for these programs;

- all compliance complaints and sales compliance information forms, or SCIFs, Wyndham generated regarding unauthorized credit accounts;

- all complaints made to Wyndham's internal integrity compliance hotline about deception in credit card applications; and

- all other complaints, grievances, or concerns submitted to Wyndham or Comenity/Alliance regarding unauthorized credit cards or lines of credit.

## V.    CLASS ACTION ALLEGATIONS

66.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Nationwide Class defined as:

**Nationwide Class:**

All persons in the United States (including its territories and the District of Columbia) who received a Wyndham-brand credit card or line of credit without their assent, excluding those persons who activated or registered the Wyndham-brand credit card or line of credit.

67.     In addition to the Nationwide Class, and pursuant to Federal Rules of Civil

Procedure 23(c)(5), Plaintiffs seek to represent the following class as well as any subclasses or

issue classes as Plaintiffs may propose and/or the Court may designate at the time of class

certification:

**Missouri Class:**

All persons in the State of Missouri who received a Wyndham-brand credit card
or line of credit without their assent following a transaction in Missouri,
excluding those persons who activated or registered the Wyndham-brand credit
card or line of credit.

68.     Excluded from the classes are Defendants and their subsidiaries, affiliates, and

officers; all persons who timely elect to exclude themselves from the classes; and the judge to

whom this case is assigned and his or her immediate family. Plaintiffs reserve the right to revise

the class definitions based on information learned through discovery.

69.     Certification of Plaintiffs' claims for classwide treatment is appropriate because

Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages

on a classwide basis using the same evidence as would be used to prove those elements in

individual actions alleging the same claim. This action has been brought and may properly be

maintained on behalf of the Nationwide Class and/or the Missouri Class proposed herein under

Federal Rule of Civil Procedure 23.

70.     Membership in these classes may be determined by objective criteria in material

obtained through discovery, including indicators of unauthorized accounts, such as account

inactivity. Plaintiffs reserve the right to modify the definitions of the classes and define

additional classes prior to class certification.

### A. Class Certification Requirements

71. **Numerosity – Rule 23(a)(1):** The members of each of the classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable. Based on available reports regarding the prevalence of Defendants' misconduct, plaintiffs believe there are hundreds or thousands of class members. The precise numbers of class members can be ascertained through discovery, which will include Wyndham's and Comenity's records.

72. **Commonality and predominance – Rules 23(a)(2) and 23(b)(3):** This action involves significant common questions of law and fact, which predominate over any questions affecting individual class members, including, but not limited to:

A. Whether Defendants engaged in the conduct alleged in this complaint;

B. Whether Defendants violated the Truth in Lending Act;

C. Whether Defendants violated the Missouri Merchandising Practices Act;

D. Whether Defendants violated the Delaware Consumer Fraud Act;

E. Whether and how Wyndham and its employees engaged in unlawful practices in order to cause credit cards to be issued in consumers' names without their authorization;

F. Whether Wyndham knew or should have known of its employees' unlawful, unfair, and deceptive practices in submitting credit applications in the names of consumers without authorization and causing credit cards to be issued in their names; and

G. Whether as a result of Wyndham's misconduct, Plaintiffs and the classes are entitled to equitable and declaratory relief and, if so, the nature of such relief.

73. **Typicality – Rule 23(a)(3):** The representative Plaintiffs' claims are typical of the claims of the members of the classes. Plaintiffs and all class members have been injured by Defendants' same wrongful practices. Plaintiffs' claims arise from the same practices and course

of conduct that give rise to the claims of the class members and are based on the same legal theories.

74. **Adequacy – Rule 23(a)(4):** Plaintiffs are representatives who will fully and adequately assert and protect the interests of the classes and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the classes.

75. **Declaratory and injunctive relief – Rule 23(b)(2):** Defendants have acted or refused to act on grounds generally applicable to plaintiff and the other class members, making final injunctive and declaratory relief, as described below, appropriate with respect to the classes as a whole.

76. **Superiority – Rule 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would not be practicable for class members to individually seek redress for Defendants' misconduct. Even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI. TOLLING OF ANY APPLICABLE STATUTES OF LIMITATIONS

### A. Discovery Rule

77.     The discovery rule delays the date on which a statute of limitations starts to run. Despite their diligence, Plaintiffs and class members did not discover and could not have discovered the facts that form the basis for their causes of action on the day the conduct occurred. In particular, Plaintiffs and class members had no ability to know that Defendants were surreptitiously submitting and processing credit card applications on their behalf as part of a well-worn practice of defrauding consumers.

78.     Plaintiffs had the reasonable expectation that Defendants would not sign them up for a line of credit or credit card without permission.

79.     Any statutes of limitation otherwise applicable to any claim asserted have been tolled under the discovery rule by the inability of Plaintiffs and the class members to have a reasonable opportunity to discover, in real time, the unlawful injury giving rise to this complaint.

### B. Equitable Tolling

80.     Equitable tolling pauses the statute of limitations after it has begun. Plaintiffs knew they did not sign up for Wyndham/Comenity lines of credit. Defendants did not contact Plaintiffs to inform them that Wyndham submitted unauthorized credit applications on their behalf, or that Comenity had processed those applications. Nor, on information and belief, have Defendants contacted any class members to inform them of this misconduct.

81.     When Plaintiffs inquired about the credit accounts they received, Wyndham explicitly denied they were unauthorized.

82.     Because there was excusable delay by Plaintiffs and the class members for bringing claims, any statutes of limitation have been tolled by the doctrine of equitable tolling until the discovery of the conduct giving rise to this complaint.

## C.     Estoppel

83.     Wyndham was under a continuous duty to inform Plaintiffs and Class Members that it had submitted credit card applications without their knowledge or consent, and Alliance and Comenity likewise had a duty to disclose they had processed such applications. Yet, Defendants have never informed Plaintiffs (nor, on information and belief, class members) of this misconduct and, in fact, Wyndham denies it. This delay increased the harm to Plaintiffs and the classes. Because of Defendants' concealment of its misconduct, Plaintiffs and class members did not and could not know of the existence of their claims when they arose.

84.     Based on the foregoing, Defendants are estopped from relying on statutes of limitation in defense of this action.

## VII.     CAUSES OF ACTION

### Count I – Violations of Missouri Merchandising Practices Act,
### Mo. Stat. §§ 407.010 *et seq.*

85.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of the complaint as if fully restated here.

86.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class or, in the alternative, Plaintiffs bring this claim on behalf of themselves and the Missouri Class.

87.     The purpose of the Missouri Merchandising Practices Act (MMPA) is to protect consumers by expanding the common law definition of fraud to preserve honesty, fair play, and right dealings in public transactions.

88.     The MMPA prohibits unfair or deceptive practices done "in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Stat. § 407.020(1).

89.     Merchandise under the MMPA means "any objects, wares, goods, commodities, intangibles, real estate or services." Mo. Stat. § 407.010(4).

90.     The extension of credit constitutes a "sale" of "merchandise" under the MMPA. *See id.* at (4), (6).

91.     Defendant Wyndham's misleading timeshare presentations to Plaintiffs and Class Members, and Defendants use of those presentations to enroll Plaintiffs and Class Members in unwanted credit card accounts, constitute unfair and deceptive practices done in connection with the sale or advertisement of merchandise under the MMPA.

92.     Plaintiffs purchased or leased merchandise from Defendant Wyndham primarily for personal, family, or household use and suffered an ascertainable loss of money or property, including harm to credit, due to Defendants' unfair or deceptive practices. Plaintiffs acted reasonably in their interactions with Defendants and suffered individual damages that can be calculated with a reasonable degree of certainty.

93.     Plaintiffs seeks to recover damages, punitive damages, fees, equitable relief, and any other relief the Court may deem just and proper for themselves and Class Members under the MMPA.

### Count II – Violations of the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, § 2513

94.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of the complaint as if fully restated here.

95.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class.

96.     The Delaware Consumer Fraud Act ("CFA") prohibits a variety of deceptive and fraudulent practices in connection with the sale or advertisement of merchandise or products. The CFA provides:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any

merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

Del. Code Ann. tit. 6, § 2513.

97.     As alleged throughout this complaint, Defendants engaged in deceptive acts or practices by opening accounts and financial products in the names of customers without their knowledge or consent.

98.     Defendant Wyndham is a Delaware corporation. Defendant Alliance Data Systems Corporation is a Delaware corporation that according to its 2020 Annual Report to the Securities and Exchange Commission maintains an office for card services in Wilmington, Delaware.

99.     As a result of Defendants' misconduct, Plaintiffs and the classes have been damaged in an amount to be proven at trial.

**Count III – Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.***

**(Asserted Against Comenity and Alliance Defendants)**

100.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of the complaint as if fully restated here.

101.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class or, in the alternative, Plaintiffs bring this claim on behalf of themselves and the Missouri Class.

102.     Each time Comenity starts a new credit card, it obtains a "consumer report," as that term is defined in the Fair Credit Reporting Act (the "FCRA") about the consumer for whom the credit card is started. 15 U.S.C. § 1681a(d).

103.     Alliance/Comenity is required by 15 U.S.C. §§ 1681b, 1681n, and 1681o to refrain from obtaining or using consumer reports from consumer reporting agencies under false pretenses and without proper authorization from the consumer who is the subject of the report.

104.    Obtaining and using consumer reports in the process of starting unauthorized credit cards is not allowed pursuant to the FCRA, and thus is a violation of federal law.

105.    Alliance/Comenity has a mandatory duty to use or obtain consumer reports only for permissible purposes. 16 U.S.C. § 1681b(f).

106.    Despite these clear and unambiguous requirements of the FCRA, Alliance/Comenity regularly obtains consumer reports regarding consumers without their knowledge or consent in order to cause new unauthorized credit cards to be issued, in violation of the FCRA.

107.    Pursuant to 15 U.S.C. §§ 1681n and 1681o, Alliance/Comenity is liable for negligently and willfully violating the FCRA by obtaining consumer reports without a permissible purpose or authorization under the FCRA.

108.    Plaintiffs and Class Member are entitled to actual damages, statutory damages, and all other available remedies under FCRA.

**Count IV – Unauthorized Issuance of Credit Cards under the Truth in Lending Act and Regulation Z**

109.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of the complaint as if fully restated here.

110.    The Truth in Lending Act ("TILA") provides that "[n]o credit card shall be issued except in response to a request or application therefor." 15 U.S.C. § 1642.

111.    Regulation Z states that no credit card may be issued to any person except in response to an oral or written request or application for the card. 12 C.F.R. § 1026.12(a)(1).

112.    Defendants issued credit cards to consumers without their knowledge or consent and not in response to an oral or written request for the card.

113.     Defendants Comenity Capital Bank and Alliance Data are card issuers under TILA. 15 U.S.C. § 1602(o);12 C.F.R. § 1026.2(a)(7)

114.     Wyndham is also a card issuer under TILA because it acted as Comenity/Alliance's agent under 15 U.S.C. § 1602(o) and 12 C.F.R. § 1026.2(a)(7). Wyndham had express or implied actual authority to act as Comenity/Alliance's agent because Wyndham's employees directly market Comenity/Alliance's "Vacation Club" card to consumers on behalf of Comenity/Alliance. To do so, under the parties' agreement Wyndham has "access to Alliance Data's innovative mobile marketing solutions, including mobile credit acquisition and robust SMS marketing platforms."[19] In short, Wyndham acted as Comenity/Alliance's agent in the creation of credit card applications because that was the stated purpose of Comenity/Alliance, the principal: "to drive credit applications" to Comenity/Alliance through its agent Wyndham.[20]

115.     In addition, Wyndham acted with apparent authority from Comenity/Alliance, because Plaintiffs and Class Members would reasonably believe that Wyndham's employees had Comenity/Alliance's authority to surreptitiously submit unauthorized credit applications in their name. For example, a recent Club Wyndham credit agreement available on Comenity's website[21] directs cardholders to Wyndham Resorts for questions about "available plans and offer terms":

**Applicable to All Promotional Credit Plans**

- **Available plans and offer terms are subject to change. Plan availability may be limited to certain locations or web purchases. For more information, visit a participating Wyndham Resort for Wyndham Vacation Ownership location.**

---

[19] Press Release, Alliance Data Systems Corp. (June 12, 2018),
https://www.sec.gov/Archives/edgar/data/1101215/000110121518000126/exhibit_99-1.htm.
[20] *Id.*
[21] Comenity Capital Bank, *Vacation Club Credit Account: Credit Card Agreement*,
https://d.comenity.net/vacationclub/pub/requestCca/requestCca.xhtml.

116.     Alternatively, Wyndham acted as Alliance/Comenity's agent because Alliance/Comenity ratified Wyndham's acts by issuing credit accounts to Plaintiffs and other Class Members who did not request or apply for those accounts.

117.     Defendants' violations were not unintentional, nor did Defendants maintain procedures reasonably adapted to avoid the violations, such as requiring unique electronic signatures by stylus or finger.

118.     Defendants have therefore violated TILA and Regulation Z. 15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)(1).

## Count V – Declaratory Relief

119.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of the complaint as if fully restated here.

120.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class or, in the alternative, Plaintiffs brings this claim on behalf of the Missouri Class.

121.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

122.     As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiffs and class members.

123.     Plaintiffs and the classes seek an order declaring that Defendants' practices of completing credit applications and submitting them without authorization from the consumer and misrepresenting to consumers the reasons for obtaining their personal information are unlawful, and that Defendants are liable to Plaintiffs and the classes for damages caused by those practices.

## VIII.   REQUEST FOR RELIEF

124.    Plaintiffs, individually and on behalf of all others similarly situated, request judgments against Defendants as follows:

A.      For an order certifying the classes and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and appointing Plaintiffs as the representatives of the classes and appointing the lawyers and law firm representing Plaintiffs as counsel for the classes;

B.      Declaring Defendants' actions to be unlawful;

C.      Permanently enjoining Defendants from performing further unfair and unlawful acts as alleged in this complaint;

D.      For all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the classes, including disgorgement and all other relief allowed under applicable law;

E.      For costs;

F.      For both pre-judgment and post-judgment interest on any amounts awarded;

G.      For appropriate injunctive relief, including public injunctive relief, *e.g.*, an order compelling Defendants to correct their nationwide policies that promote and condone the opening of unauthorized accounts;

H.      For treble damages insofar as they are allowed by applicable laws;

I.      For appropriate individual relief as requested above;

J.      For payment of attorneys' fees and expert fees as may be allowable under applicable law; and

K.      For such other and further relief, including declaratory relief, as the Court may deem proper.

## IX. DEMAND FOR JURY TRIAL

125.    Plaintiffs hereby demand a jury trial on all issues so triable.

Dated February 18, 2021

Respectfully Submitted,

**STRONG, GARNER, BAUER, P.C.**

*/s/ Jacob Lewis*
Steve Garner – MO Bar #35899
Jacob Lewis – MO Bar #67412
415 E. Chestnut Expressway
Springfield, MO 65802
Phone 417-887-4300
Fax 417-887-4385
sgarner@stronglaw.com
jlewis@stronglaw.com

**KELLER ROHRBACK L.L.P.**
Gretchen Freeman Cappio, *Pro Hac Vice forthcoming*
Gabriel E. Verdugo, *Pro Hac Vice forthcoming*
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
gcappio@kellerrohrback.com
gverdugo@kellerrohrback.com

Alison E. Chase, *Pro Hac Vice forthcoming*
Matthew J. Preusch, *Pro Hac Vice forthcoming*
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497
achase@kellerrohrback.com
mpreusch@kellerrohrback.com
***Attorneys for Plaintiffs***